**Petition of BERNHEIMER et al.**

**No. 7935.**

Circuit Court of Appeals, Third Circuit.

Argued April 10, 1942.

Decided Aug. 3, 1942.

Thomas Raeburn White, of Philadelphia, Pa. (Hamilton Page, C. L. Cushmore, Jr., and White & Staples, all of Philadelphia, Pa., on the brief), for petitioners.

Philip H. Strubing, of Philadelphia, Pa. (Evans, Bayard & Frick, of Philadelphia, Pa., on the brief), for Judge Barksdale.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

The petitioners, Caroline Bernheimer and Franz Bernheimer, a mother and her son, are Jewish refugees who fled from the German Reich. Both came lawfully into the United States and have registered as aliens as required by law, 54 Stat. 673, 8 U.S.C.A. §§ 451–460. They reside in Montgomery County in the Eastern District of Pennsylvania. Caroline Bernheimer has received her first papers for naturalization as a citizen of the United States. Franz Bernheimer has applied for his first papers but he has not resided in the United States a sufficient length of time to qualify him to receive them. Both petitioners were injured in an automobile accident which occurred on February 2, 1941. They brought suit for damages in the District Court of the United States for the Eastern District of Pennsylvania on February 28, 1941. Their case was at issue, ready for trial and on the January, 1942, list when the defendant moved to strike it from the list on the ground that the petitioners were alien enemies not competent to maintain an action in the civil courts of the United States. The court granted the motion.[1] A subsequent application on the part of the petitioners to restore the case to the list was denied. Since the order of the District Court was not an order from which an appeal could be taken, the petitioners have brought their present proceeding in this court and pray that we may direct the District Court of the Eastern District of Pennsylvania to restore the case to the list.

The question for our determination may be stated as follows: Does the war between the United States and Germany suspend the right of a citizen of Germany resident in the United States to prosecute a civil action in a court within the United States.

The learned District Judge held, by reason of the omission of certain words from the Presidential Proclamation relating to enemy aliens of December 8, 1941,[2] words which appeared in a Presidential Proclamation[3] promulgated shortly after our declaration of war against Germany in 1917, that there was "a deliberate attempt on the part of our Government" to take from resident alien enemies the right to prosecute civil actions during the war. Before dealing specifically with these proclamations, we think it desirable to discuss

[1] See Bernheimer v. Vurpillot, D.C., 42 F.Supp. 830.

[2] No. 2526, promulgated pursuant to Section 21 of Title 50 of the United States Code, 50 U.S.C.A. § 21.

[3] 40 Stat. Part 2, p. 1650. The learned trial judge states that the Proclamation in 1917 was made "shortly after our entry into the war with Germany and Austria-Hungary". War with Germany was declared on April 6, 1917, 40 Stat. 1 and with Austria-Hungary on December 7, 1917, 40 Stat. 429.

briefly the rights of the enemy alien at common law.

█ Since the end of the seventeenth century and the decision of the Court of the King's Bench in Wells v. Williams, 1697, 1 Ld. Raym. 282, 91 Eng.Rep. 1086, it has been the law that an alien resident within the realm of England could maintain a civil action in the English courts per licentiam and sub protectione domini regis (by the King's license and under his protection). Prior to that time in England when the King engaged in war it was the duty of his subjects to plunder and kill his enemies wherever found.[4] In Wells v. Williams, Treby C. J. stated a rather delicate reason for the reversal of English authority and said that "* * * the necessity of trade has mollified the too rigorous rules of the old law in their restraint and discouragement of aliens." The next step in the English law was the implication of a license from the very fact that the enemy citizen or subject was interned or incarcerated within the realm. See Schaffenius v. Goldberg, [1916] 1 K.B. 284; Porter v. Freudenberg, [1915] 1 K. B. 857; Princess Thurn and Taxis v. Moffitt, [1915] 1 Ch. 58; Sparenburg v. Bannatyne [1797], 1 Bos. & Pul. 163; Maria v. Hall, 1 Taunt. *33 [C.P.1807].

In Clark v. Morey, 10 Johns. 69, Chancellor Kent in the first application of these principles by an American court, established the rule that lawful residence in the United States in and of itself operates as a license to sue in the absence of an executive mandate to the contrary. See Birge-Forbes Co. v. Heye, 251 U.S. 317, 40 S. Ct. 160, 64 L.Ed. 286.[5] In the Birge-Forbes Co. case Mr. Justice Holmes said at page 323 of 251 U.S., at page 161 of 40 S.Ct., 64 L.Ed. 286: "There is nothing 'mysteriously noxious' * * * in a judgment for an alien enemy. Objection to it in these days goes only so far as it would give aid and comfort to the other side." The Supreme Court approved a direction in the judgment that the sum recovered should be paid to the Alien Property Custodian.

It is not even the case that a suit may not be prosecuted on behalf of an enemy subject even though resident in enemy or neutral territory. Such suits are occasionally allowed to proceed to judgment where adequate measures may be taken to prevent advantage to the enemy. See Birge-Forbes Co. v. Heye, supra; Propper v. Buck, 178 Misc. 76, 33 N.Y.S.2d 11, affirmed 263 App. Div. 948, 34 N.Y.S.2d 134; Weiditschka v. Supreme Tent of Knights of Maccabees of the World, 188 Iowa 183, 170 N.W. 300, 175 N.W. 835; Geiringer v. Swiss Bank Corp. [1940] 1 All Eng.R. 406 and White Engineering Corp. v. Canadian Car and Foundry Co. [1940] 43 Quebec Pr. 419.

█ Today sums realized on judgments in favor of resident alien enemies can be frozen by the Secretary of the Treasury. See Executive Order No. 8389 of April 10, 1940, as amended, 5 Fed.Reg. 1400. The courts in which such judgments were rendered can "attach" or otherwise control any funds accruing under them. Propper v. Buck, supra, at page 13 of 33 N.Y.S. 2d; Weiditschka v. Supreme Tent of Knights of Maccabees of the World, supra, at page 303 of 170 N.W. The President possesses the power to regulate the conduct of enemy aliens residing within the United

---

[4] See the scholarly articles "The Right of Resident Alien Enemies to Sue" by Messrs. Sterck and Schuck, Georgetown Law Journal, Vol. 30, No. 5, p. 421 and "Enemy Litigants in Our Courts" by Mr. George Gordon Battle, Virginia Law Review, Vol. 28, No. 4, p. 429.

[5] Some of the cases, old and new, which have followed this principle are: Verano v. DeAngelis Coal Co., Inc., D.C., 44 F. Supp. 726; Stern v. Ruzicka, D.C., 44 F. Supp. 726; Anastasio v. Anastasio, D. C., 44 F.Supp. 725; Uberti v. Maiatico, D.C., 44 F.Supp. 724; Kaufman v. Eisenberg, 177 Misc. 939, 32 N.Y.S.2d 450; Plettenberg, Holthaus & Co. v. I. J. Kalmon & Co., D.C., 241 F. 605; Society for Propagation of Gospel v. Wheeler, 22 Fed.Cas. page 756. No. 13,156; Otteridge v. Thompson, 18 Fed.Cas. page 910, No. 10,618; Superior & Pittsburg Copper Co. v. Davidovich, 19 Ariz. 402, 171 P. 127; Kristel v. Michigan Central R. R., 213 Ill.App. 518; Wolf v. Cudahy Packing Co., 105 Kan. 317, 182 P. 395; Mittelstadt v. Kelly, 202 Mich. 524, 168 N. W. 501; Posselt v. D'Espard, 87 N.J.Eq. 571, 100 A. 893; Arndt-Ober v. Metropolitan Opera Co., 102 Misc. 320, 169 N.Y.S. 304, affirmed 182 App.Div. 513, 169 N.Y.S. 944; Barna v. Gleason Coal & Coke Co., 83 W.Va. 216, 98 S.E. 158; Krachanake v. Acme Mfg. Co., 175 N.C. 435, 95 S.E. 851, L.R.A.1918E, 801, Ann. Cas.1918E, 340. See again "The Right of Resident Alien Enemies to Sue", supra, pp. 423–424, and "Enemy Litigants in Our Courts", supra, pp. 429, 442, 443.

States. Alien Enemy Act, 50 U.S.C.A. § 21. The Alien Property Custodian may vest in himself any property of any foreign national or country. First War Powers Act, 1941, 55 Stat. 838, 50 U.S.C.A.Appendix § 601 et seq., Executive Order No. 9095 of March 11, 1942, 7 Fed.Reg. 1971. Today the proceeds of a judgment secured by a resident enemy alien whether in a state or federal court may be so guarded that they will be of no benefit to the enemy.

The respondent takes the position that there is a difference of authority in the state and federal courts and contends that while the state decisions allow suits by an enemy alien, the decisions of the federal courts require suspension of the proceeding until peace has been concluded. We cannot agree with the last assertion of the respondent. The weight of authority in the federal courts permits the prosecution of a suit by the resident enemy alien. The Supreme Court did not directly settle this question in Birge-Forbes Co. v. Heye, supra, for the plaintiff in that case was a non-resident alien who became an enemy after judgment had been rendered in his favor. But four very recent decisions of inferior federal courts permit suits by resident enemy aliens. They are Verano v. DeAngelis Coal Co., Inc., supra; Anastasio v. Anastasio, supra. Uberti v. Maiatico, supra and Stern v. Ruzicka, supra. We think that the earlier decisions of the federal courts do not support the respondent's contention that the resident enemy alien may not maintain a suit, though there is some obiter to that effect. See Hanger v. Abbott, 6 Wall. 532, 18 L.Ed. 939; Masterson v. Howard, 18 Wall. 99, 21 L.Ed. 764 and Mumford v. Mumford, Fed.Cas.No. 9918.

As a matter of fact none of the federal decisions cited by the respondent in support of its proposition is in point. The case cited which presents the closest analogy to that at bar is The Oropa, D.C., 255 F. 132. But in The Oropa, the plaintiff himself urged that his action be suspended until the conclusion of peace. He did not take the position that he should be allowed to prosecute his action to judgment immediately.

The decision of the Supreme Court in Ex parte Colonna, 314 U.S. 510, 62 S.Ct. 373, 86 L.Ed. 379, is of no aid to the respondent. In that case the Royal Italian Ambassador by applying for writs of prohibition and mandamus sought to protect a vessel and its cargo of oil alleging it to be the property of the Italian Government and therefore entitled to the benefit of Italy's sovereign immunity. The Supreme Court refers to the definition of the word "enemy" as set forth in Section 2(b) of the Trading with the Enemy Act, 40 Stat. 411, 50 U.S.C.A. Appendix § 2. Section 2(a) of the Act by its definition of "enemy" makes the Act applicable to persons residing in enemy country or trading therein. The petitioners do not come within such classification. Section 2(b) makes the Act applicable to the government of any nation with which the United States is at war. The declaration of war between the United States and Italy took place on December 11, 1941 and was in effect when the Supreme Court decided Ex parte Colonna. Section 2(c) describes as an "enemy" such other individuals as may be citizens of any nation with which the United States is at war, wherever resident, as the President by proclamation shall include within the term "enemy".[6] In Ex parte Colonna the Supreme Court made plain that war suspends the right of an enemy plaintiff to prosecute an action in our courts. But the "enemy" described in Sections 2(a), (b) and (c) of the Trading with the Enemy Act is not the "enemy alien" described in the Alien Enemy Act, 40 Stat. 531, 50 U.S.C.A. § 21. The petitioners in the case at bar are "alien enemies" within the meaning of the Alien Enemy Act. They are not "enemies" within the meaning of Section 2 of the Trading with the Enemy Act. It should be noted that the President has issued no proclamation pursuant to the provisions of Section 2(c) of the Trading with the Enemy Act.[7] The petitioners are not prohibited from maintaining the suit at bar by anything contained in any Act of Congress or any presidential proclamation or in any executive order. Both upon reason and authority it is clear that a resident alien enemy may

---

[6] Section 7(b) of the Trading with the Enemy Act states that nothing in the Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy prior to the end of the war except as provided in Section 10 which relates to patent, trademark and copyright suits.

[7] Department of Justice Press Release, January 31, 1941.

maintain his suit in courts within the United States or in any court of the United States.

Certain proclamations promulgated by President Wilson during the course of the First World War were applicable to German [8] and to Austro-Hungarian [9] subjects resident in the United States. These proclamations contained statements [10] with respect to the conduct to be observed by citizens of the United States toward German and Austro-Hungarian subjects and it is to these admonitions and injunctions and to their omission from proclamations promulgated by President Roosevelt that the learned District Judge adverted and which furnished the basis of his reasoning. Similar reasoning was employed by the courts in the Krachanake case and in State ex rel. Constanti v. Darwin, 1918, 102 Wash. 402, 173 P. 29. The phrases relied on by the learned District Judge in the case in which the petitioners here were the plaintiffs are without the significance which he attributed to them. Comparison of the Proclamation of 1917 with that of 1941 shows that they are in no sense in pari materia for the substantive differences between them are very great. The statement of the Attorney General issued to the press on January 31, 1942, makes plain the intention of President Roosevelt in promulgating Proclamations relating to alien enemies.[11] That intention was to subject the alien enemy to regulation, supervision and, if necessary, incarceration, but it was not the intention of Congress or the President to prevent the resident enemy alien from maintaining suits in courts within the United States.

The writ will issue.

---

[8] Proclamation No. 1364 (1917).

[9] Proclamation No. 1417 (1917).

[10] The omitted phrases are:

"* * * and so long as they shall conduct themselves in accordance with law, they shall be undisturbed in the peaceful pursuit of their lives and occupations and be accorded the consideration due to all peaceful and law-abiding persons, except so far as restrictions may be necessary for their own protection and for the safety of the United States; and towards such alien enemies as conduct themselves in accordance with law, all citizens of the United States are enjoined to preserve the peace and to treat them with all such friendliness as may be compatible with loyalty and allegiance to the United States; * * *"

[11] Attorney General Biddle stated:

"Proclamations have been issued by the President which govern the conduct to be observed by alien enemies in this country and which delegate to the Attorney General the authority to apprehend and detain specified alien enemies whom the Attorney General deems dangerous to the public peace and safety of the United States.

"These proclamations were issued under the authority granted by Section 21 of Title 50, United States Code, and careful note should be taken of the fact that they are not in any way an exercise of the power vested in the President by the above-mentioned Section 2(c) of the Trading with the Enemy Act.

"Accordingly, it is important to note that no native, citizen, or subject of any nation with which the United States is at war and who is resident in the United States is precluded by federal statute or regulations from suing in federal or state courts."